Filed 1/9/14  Marriage of Banhagel and Sheveleva CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re Marriage of MATTHEW K. BANHAGEL and ELENA SHEVELEVA. | D061873 |
| MATTHEW K. BANHAGEL, | |
| Respondent, | (Super. Ct. No. DN163215) |
| v. | |
| ELENA SHEVELEVA, | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Patti C. Ratekin, Commissioner.  Affirmed.

Stephen Temko and Dennis Temko for Appellant.

Law Office of James D. Scott, James D. Scott and Andrew J. Botros for Respondent.

Elena Sheveleva appeals from a judgment annulling her marriage to Matthew Banhagel. She asserts the judgment is reversible per se because she was denied her constitutional right to a fair trial. We reject her assertions and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Elena does not challenge the sufficiency of the evidence supporting the family court's decision and, while the parties disagree on the facts surrounding the breakdown of their marriage, they are well aware of the facts of this dispute. Accordingly, we merely summarize some of the facts to provide background for our later discussions.

Matthew met Elena on an international dating Web site in May 2008. Elena was from Russia. She has an adult son and a nine-year-old daughter with her ex-husband. Elena spoke only a bit of English and the couple communicated by e-mail using a translation program. In August 2008, Matthew visited Russia to meet Elena in person. The couple had sex for the first time. In June 2009, the couple agreed to marry.

A few weeks before the wedding, Matthew experienced gaps in communication with Elena where she did not e-mail him or answer the telephone. During this time, Matthew noticed that Elena remained active with other users on the dating Web site. When Matthew questioned Elena's sincerity, Elena convinced him that she was marrying him for "nothing other than love and devotion." The couple married at the end of June 2009 in Russia, but the couple did not have sex on their wedding night. In early June 2010, Elena arrived in the United States. After Elena came to America, Matthew claimed they had sex twice and that Elena displayed no affection and became very frivolous with

2

money. In contrast, Elena claimed that she wanted to have sex with Matthew, but that cats in the bed created problems with their sex life.

In July 2010, the couple's communication broke down and Matthew began to suspect that he might be a victim of fraud. In November 2010, Matthew filed for a nullity of marriage, alternatively for dissolution of marriage. Before trial, Elena submitted nine declarations. One declaration was from her daughter's teacher, the other declarations were from people Elena knew in Russia that were translated into English. When trial commenced, the family court stated it would not consider any declarations and would only consider the testimony of the witnesses at trial. Matthew and Elena testified at trial. The only other witness was Oksana Voazzo, a Russian woman who also met her husband on a dating Web site. Oksana became friends with Elena and claimed that they "became pretty close."

The family court ordered the marriage annulled after concluding that Elena committed fraud by entering into the marriage with no intention of performing her marital duties. In its written intended decision, the court referenced the witness declarations tendered by Elena. When Elena's counsel objected to these references, the court replied that it did not recall its prior ruling and considered the declarations for "credibility and . . . impeachment" and not for the truth of the matter asserted.

The court concluded that Elena was not credible, stating it would have come to this conclusion based on the testimony of the three trial witnesses even if the declarations had been excluded. The court then ruled that its statements would constitute a statement of decision.

At a later hearing, the family court indicated that it had reviewed the earlier transcripts and realized it previously stated that the declarations would not be considered. The court stated: "So the only way that I feel is appropriate to handle it is to allow them to reopen as to the issue what was brought up, what I considered out of the declarations." Elena's counsel then asked: "So we're talking about [Elena's] testimony and whatever evidence is, I guess, corresponding to that?" The court responded that it did not have a copy of its decision, but wanted everyone to feel that they have been treated fairly.

The continued trial was ultimately set for hearing. At that time, Elena invoked the Fifth Amendment privilege against self-incrimination and requested a continuance until immigration proceedings against her were concluded. Although the court believed that the individuals who had written the declarations would testify, Elena had no witnesses to present. The court denied the request for a continuance based on the concern that the immigration case could take years to finish. The family court explained that after it discovered the mistake regarding the declarations:

> "I didn't think it was fair to her that she didn't have an opportunity to present evidence to overcome using those declarations, even though I told counsel that without them I could have come to the same decision. There were enough contradictions without using those declarations in her testimony alone as compared to—just within her testimony she was like 180 degrees difference on a lot of different really important issues. . . . But I still wanted to give her the benefit of having the opportunity to call witnesses if she thought that it could overcome something. We're here today for trial."

The court entered a judgment that incorporated its intended decision. Elena timely appealed.

4

DISCUSSION

In general, a trial court has discretion to grant or deny a continuance with the burden resting on the complaining party to demonstrate from the record that an abuse has occurred. (*Forthmann v. Boyer* (2002) 97 Cal.App.4th 977, 984-985.) Nonetheless, when a trial court's error amounts to structural error, reversal is required without regard to the strength of the evidence or other circumstances. (*In re Enrique G.* (2006) 140 Cal.App.4th 676, 685.) Structural errors requiring automatic reversal include violating a party's right to present testimony and evidence. (*Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 290-291.)

Elena contends the family court committed reversible error when it failed to continue the trial until the removal proceedings against her had concluded because she was deprived of the right to present evidence after she properly invoked her Fifth Amendment privilege against self-incrimination. We disagree.

The Fifth Amendment to the United States Constitution guarantees that a person may not be compelled to testify or give evidence against herself. (*Maness v. Meyers* (1975) 419 U.S. 449, 461.) A witness may properly invoke the Fifth Amendment privilege if the witness "reasonably apprehends a risk of self-incrimination, . . . though no criminal charges are pending against [the witness], . . . and even if the risk of prosecution is remote." (*Wehling v. Columbia Broadcasting System* (5th Cir. 1979) 608 F.2d 1084, 1087, fn. 5.) "However, a party is not entitled to decide for himself or herself whether the privilege against self-incrimination may be invoked. ' "Rather, this question is for the court to decide after conducting 'a particularized inquiry, deciding, in connection with

5

each specific area that the questioning party seeks to explore, whether or not the privilege is well founded.' " ' " (*Fuller v. Superior Court* (2001) 87 Cal.App.4th 299, 305, italics omitted.) The person claiming the privilege has the burden of showing that the proffered evidence is incriminating. (Evid. Code, § 404.) If the objecting party carries his or her burden, then the judge must sustain the claim of privilege unless it clearly appears that the proffered evidence cannot possibly have a tendency to incriminate the person. (*People v. Seijas* (2005) 36 Cal.4th 291, 304-305.)

On this record, we cannot conclude that the trial court's refusal to continue the trial based on Elena's blanket invocation of the Fifth Amendment privilege amounted to reversible error. The trial court considered the declarations solely for impeachment and determining Elena's credibility. Accordingly, the purpose of reopening the evidence was to allow examination of the witnesses that provided the declarations or redirect examination of Elena to explain or rebut inferences based on the family court's consideration of the declarations and thereby rehabilitate Elena's credibility. (See *People v. Cleveland* (2004) 32 Cal.4th 704, 746.)

At the continued trial, Elena did not bring the declarants; rather, she sought to testify to rebut evidence or inferences from the declarations. Elena, however, failed to explain how any testimony she might offer to rebut the declarations tended to incriminate her. Thus, it is impossible to determine whether her invocation of the Fifth Amendment privilege was well founded. Assuming, without deciding, that Elena properly invoked the Fifth Amendment privilege, we cannot conclude that the trial court's failure to continue the trial amounted to a denial of due process because Elena was not denied the

6

right to present evidence. She could have presented the declarants or other witnesses at the hearing.

Under the lesser abuse of discretion standard, "an abuse of discretion results in reversible error only when the denial of a continuance results in the denial of a fair hearing, or otherwise prejudices a party." (*Freeman v. Sullivant* (2011) 192 Cal.App.4th 523, 527.) Elena has not demonstrated prejudice as the family court stated it would have come to the same conclusion based on the testimony of the three trial witnesses even if the declarations had been excluded. Although not challenged by Elena, the evidence presented at trial supported the family court's finding that Elena entered into the marriage with no intention of performing her marital duties.

A marriage may be adjudicated a nullity if, at the time of the marriage, "[t]he consent of either party was obtained by fraud." (Fam. Code, § 2210, subd. (d).) The showing of fraud necessary to warrant nullification must be of a type that " 'goes to the very essence of the marriage relation.' " (*Marshall v. Marshall* (1931) 212 Cal. 736, 739.) The secret determination to refuse to engage in sexual intercourse is sufficient to support an annulment. (*Millar v. Millar* (1917) 175 Cal. 797, 800-801 [wife concealed from husband at time of marriage that she did not intend to have sexual relations with him]; *In re Marriage of Liu* (1987) 197 Cal.App.3d 143, 156 [wife married husband in Taiwan to acquire a green card, and concealed intention not to engage in sexual relations].)

Here, as noted by the family court, Elena and Matthew presented conflicting evidence on this issue. However, the family court found the testimony of the remaining witness, Oksana, to be "the most powerful." Oksana testified that when she and Elena were alone, Elena would "often" talk about Matthew. Elena told Oksana that she did not want to have sex with Matthew because "he was not adequate for her." Elena also told Oskana a number of times that she married Matthew because it was "very dangerous to remain in Russia." The family court found Oksana to be a credible witness who had no motive to lie. Additionally, as to Elena's own testimony, the family court stated "[s]he was all over the place on almost every issue. She couldn't keep a story straight."

In summary, we find no error in the family court's refusal to continue the trial.

## DISPOSITION

The judgment is affirmed. Respondent is entitled to his costs on appeal.

McINTYRE, J.

WE CONCUR:

BENKE, Acting P. J.

HALLER, J.